Richard H. MORROW and Pearl Morrow,
his Wife, Respondents,

v.

CALORIC APPLIANCE CORPORATION,
a Corporation, Appellant.

No. 49885.

Supreme Court of Missouri,

En Banc.

Nov. 11, 1963.

42

Blanton & Blanton, David E. Blanton, Sikeston, for appellant.

W. Clifton Banta, Charleston, for respondents.

HOLLINGSWORTH, Judge.

A fire in August, 1959, allegedly caused by a defective gas range, destroyed personal property owned by Mr. and Mrs. Richard Morrow. A jury awarded them $3,750 as damages against Caloric Appliance Corporation, the manufacturer of the stove. Caloric appealed to the Springfield Court of Appeals on grounds that the amount in dispute vested it with jurisdiction of the appeal. That court correctly transferred the cause here on the ground that exclusive appellate jurisdiction was in this court in that a question involving construction of the due process provisions of the United States Constitution had been properly raised and preserved on appeal by appellant. See Morrow v. Caloric Appliance Corporation, Mo.App., 362 S.W.2d 282.

Appellant's motion to quash the summons and service or, in the alternative, to dismiss

plaintiffs' action for want of jurisdiction, based upon the aforesaid constitutional grounds, was overruled. Appellant asserts reversible error as to the ruling of the court in that respect.

The case thereupon went to trial on the merits. The Morrows, who had purchased the stove from a dealer at East Prairie, Missouri, submitted their case on the sole theory that the manufacturer impliedly warranted the stove to be reasonably fit and suitable for domestic use as a gas range. Appellant contends that the trial court erred in failing to direct a verdict for it at the close of all the evidence for the reason that in the absence of privity of contract there was no implied warranty by the manufacturer. It also contends that the trial court erred in giving and refusing certain instructions.

We are of the view that, subject to the jurisdictional contentions made by appellant, respondents were entitled to submit their case against Caloric on implied warranty. It is necessary, therefore, that we first determine whether the Circuit Court of Scott County had jurisdiction of appellant or, conversely, whether that court's exercise of jurisdiction over it constituted a denial of appellant's constitutionally guaranteed right of due process.

Appellant is a foreign corporation, not licensed to do business in Missouri and with no duly designated agent to act for it. Service of process was attempted or accomplished by serving "Walter L. Vocke, Agent of the within named corporation." Appellant, appearing specially, filed its amended motion to quash the summons and service or to dismiss, averring therein and contending here that as a foreign corporation not licensed to do business and not "doing business" in Missouri and not having appointed a registered agent or an agent for service of process in this state, the assertion of jurisdiction over defendant violated the Fourteenth Amendment to the United States Constitution.

Whether Caloric was amenable to personal service in this state so as to authorize the rendition of a general judgment against it depends upon whether it was "doing business" in Missouri. The hearing on its motion developed these facts relevant to that question.

Walter L. Vocke, called as a witness in behalf of appellant, testified: He was in business for himself as a manufacturer's representative and the operator of a service agency, servicing, in the main, Caloric appliances. Since 1941 he had represented various companies including Caloric Appliance Corporation located in Topton, Pennsylvania, which manufactures gas ranges and accessories; that for the past ten or twelve years he had represented only Caloric (although his contract with it permitted other noncompetitive representations) in an exclusive territory covering the area within a radius of 150 miles of St. Louis. His office (for which he paid the rent) was and for nine years had been in his home at 1607 Thrush Terrace in St. Louis County; he was listed (1960) in the "white" pages of the St. Louis telephone directory under his name (for which he paid) and also listed at his address was "Caloric Stove Corporation" (for which Caloric paid). There was an advertisement in the "yellow pages" of the directory (for which Caloric paid) which read: "Built-ins, free-standing sinks, hoods, featuring color-coordination by Beatrice West. Offered by leading builders and dealers. A Caloric exclusive. Ranges have Gold Star features; Thermo-set top burner, meat thermometer, automatic clock-controlled oven, roto-roaster rotisserie. Where to buy them. Branch Office, Caloric Stove Corporation, 1607 Thrush." Vocke received mail at his home addressed to him, to Caloric Stove Company, and to Caloric Appliance Company; the company supplied or would supply business cards and letterheads but he preferred not to use the latter; he operated and paid the expenses of his own automobile; he had no drawing account, prepared and filed his own income tax return, received no fringe benefits from

Caloric, and it did not withhold any taxes for his benefit.

Vocke further testified: It was his purpose to produce as much business as possible for Caloric on which he was paid commissions monthly, and received a commission on all appliances sold in his territory. He was not under Caloric's control as to routes or manner of selling, but he could not change basic prices; he "set up" distributors and in some cases dealers to handle Caloric products. He obtained orders from the distributors who, in turn, resold the stoves to dealers, or he sold direct to those dealers which he had set up. The Caloric distributor in Cape Girardeau was Uregas Company and where there was a distributor he stayed out of the area and let the distributor operate as he wished; some of the distributors' orders went through his office and some were mailed direct to Topton; he would talk with the dealers and distributors from time to time. Uregas was the main distributor in outstate Missouri; in St. Louis there were three distributors who also made some sales outstate. There were, he estimated, as many as fifty dealers in his exclusive territory at the time of the hearing.

Caloric furnished catalogs and similar materials to him and he, in turn, furnished them to the dealers and distributors or, in some instances, such materials were sent direct to the distributors and dealers from Pennsylvania. Caloric advertised nationally and on some Missouri television stations and was doing so in November, 1960, at the time of the hearing, for which it paid. It also advertised in metropolitan and local newspapers under the dealer's name; that advertising was paid for half by the company and half by the dealer. Factory men in the advertising and service fields held occasional meetings in Missouri.

His further testimony was: Caloric rented warehouse space in a public warehouse in St. Louis where a stock of appliances was kept. He would send an order for merchandise either to Pennsylvania or to the St. Louis warehouse. About one half of the orders from the distributors in his area (about $100,000 in volume) was shipped from the St. Louis warehouse. Payments were sent direct to the company by the dealers and distributors. He did no collecting for the company. When merchandise was sent to a distributor, it was sold to him; the company did not consign merchandise. He estimated that the total dollar volume of Caloric sales in his area in 1960 was $200,000 to $220,000 and that over the years sales averaged close to $200,000 annually.

These questions were asked and these answers given:

"Q. Do you have a written contract with the company, Mr. Vocke? A. Yes, I do. It is an old one but I have it.

"Q. In that they set you up as their exclusive agent in this area? A. That is right, listing certain counties."

It appears that Caloric was "doing business" in Missouri so as to make it amenable to personal service in this state. Over a period of at least ten or twelve years Caloric had sold its products to distributors and dealers in Missouri and had received as a result of orders obtained from those distributors and dealers more than $2,000,000, about $200,000 annually. It maintained a warehouse within the State of Missouri (rented space in a public warehouse), where it kept a sizable stock of its merchandise which remained in the ownership of the company until sold to distributors or dealers in Missouri. About one half the total money volume of that merchandise sold to Missouri distributors and dealers was supplied from the company-owned merchandise stored in the St. Louis warehouse under the direction and control of the company; the company publicly advertised that it maintained a branch office in Missouri and solicited orders for its merchandise through that branch office, operated by its agent Vocke,

who was paid on a commission basis, who by written contract was Caloric's exclusive agent in certain specified Missouri counties and who was in charge of the "branch office" set up and from which he, as Caloric's exclusive agent, regularly sold Caloric's products to Missouri distributors and dealers which he had established.

The business activities of a foreign corporation which would constitute doing business in this state so as to make it amenable to personal service were reviewed and concisely stated in the case of Hayman v. Southern Pacific Co., Mo., 278 S.W.2d 749. In that case plaintiff, a brakeman on defendant's railroad, was injured while riding on one of defendant's trains in the State of California. Defendant operated no railroad lines or other facilities in Missouri and, while it maintained an office in St. Louis, the sole activity of the employees therein was the solicitation of freight and passenger business over defendant's line. This court, in holding that the Circuit Court of the City of St. Louis was without jurisdiction over the defendant, held, under the authority of Green v. Chicago, B. & Q. R. Co., 205 U.S. 530, 27 S.Ct. 595, 51 L.Ed. 916, that where the business shown amounted to nothing more than solicitation, it was not enough to bring the defendant within the state so that process could be served upon it. This court then proceeded to distinguish the fact situations which existed in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, and in the Missouri case of Wooster v. Trimont Mfg. Co., 356 Mo. 682, 203 S.W. 2d 411, wherein it was held that the business activities of corporations there involved were sufficient to render them subject to personal service of process. Of these cases, we said in Hayman v. Southern Pacific Co., 278 S.W.2d, supra, loc. cit. 752:

"The International Shoe case was a case of solicitation plus additional activities, 340 U.S., loc. cit. 314 [326 U.S. at p. 314], 66 S.Ct. loc. cit. 157, connected with its business, including

shipping into the state large quantities of goods manufactured by it as in the International Harvester case [234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479], as in Vilter Mfg. Co. v. Rolaff, 8 Cir., 110 F.2d 491, cited by plaintiff, in which there was also installation work done in the state, and as in Frene v. Louisville Cement Co., 77 U.S.App.D.C. 129, 134 F.2d 511, 146 A.L.R. 926, in which there was engineering work following sales. Furthermore, the International Shoe case was a suit for the collection of a tax on the privilege of employing labor in the state, which the court said has always been deemed an appropriate subject of taxation, 340 U.S., loc. cit. 321 [326 U.S. at p. 160], 66 S.Ct., loc. cit. 160, and which was specifically authorized for the activities involved by an Act of Congress as to persons engaged in interstate commerce 340 U.S., loc. cit. 315 [326 U.S. at 315], 66 S.Ct., loc. cit. 157. The Court said: 'The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.' 340 U.S., loc. cit. 319 [326 U.S. at p. 319], 66 S.Ct., loc. cit. 160. The Court then pointed out: 'The obligation which is here sued upon arose out of those very activities.' Certainly it cannot be said * * * that plaintiff's injuries arose out of any activities defendant carried on in the State of Missouri. Instead they arose out of the operation of its freight train over its tracks in the State of California, an activity which defendant did not carry on in the State of Missouri or anywhere near it. * *

"Plaintiff also relies on Wooster v. Trimont Mfg. Co., 356 Mo. 682, 203 S.W.2d 411, 414. However the obligation in that case (to pay commission on the business done), as in the Interna-

tional Shoe case, 'arose out of those very activities' carried on in Missouri. Furthermore, it was also 'a solicitation plus case', with large quantities of merchandise being shipped into this state and other services being performed here in connection therewith. The test of a corporation's ' "presence" in the state' as determined by the extent of its agent's activities, is, of course, a fiction; and as pointed out in the International Shoe case, merely symbolizes the activities of corporate agents which courts deem sufficient to satisfy the demands of due process. Therefore, it seems to us that the most reasonable and satisfactory rule is to hold that a state has jurisdiction of any action against a foreign corporation which seeks to enforce an obligation or liability arising out of acts done in the state by its agents. (See Jurisdiction Over Foreign Corporations—McBaine, 34 Cal.Law Rev. 331, 334.) This rule would reasonably limit the applicability of the Green case. Both the International Shoe case and Wooster v. Trimont Mfg. Co., supra, would come within this rule. As hereinabove shown, this case would not."

Under the rule announced in the Hayman case, the liability, if any, of Caloric unquestionably arises out of an act done by its agent or agents in this state. These activities, as we view them, were sufficient to satisfy the demands of due process.

Moreover, the facts in this case as to "doing business" also come squarely within the rule of Wooster v. Trimont Mfg. Co., supra, 356 Mo. 682, 203 S.W.2d 411. The third syllabus of that case adequately states the conclusion there reached: "A foreign corporation which was not licensed to do business in Missouri, but which had sold its products to wholesale trade therein for many years through agents who were employed on commission basis and maintained office in the state and which during preceding three years had received as a result of

activities of such agents orders from Missouri customers totalling more than $114,000, was 'doing business' in Missouri so as to be amenable to process * * *."

Appellant relies on two opinions of this court: Superior Concrete Accessories v. Kemper, Mo., 284 S.W.2d 482, and Collar v. Peninsular Gas Co., Mo., 295 S.W.2d 88. In the Kemper case the foreign corporation was seeking to maintain a suit for a declaratory judgment against its distributor to cancel the distributor's contract. The decisive question in that case was whether the foreign corporation's operations, pursuant to its agreement with its distributor, were interstate transactions (even though other activities of the corporation not pursuant to the agreement would constitute "doing business" within this state, 284 S.W.2d loc. cit. 487) so as to dispense with the requirement that the foreign corporation have a license to do business in Missouri as prerequisite to the maintenance of its suit to cancel the distributor's agreement. Furthermore, a summary of the facts in that case, 284 S.W.2d, loc. cit. 489 [11], clearly distinguishes it from the present one. It is not controlling under the facts here shown.

In the Collar case, supra, the only act done by the foreign corporation in Missouri was the prosecution of an action against its insurance agent who did business in the state. The court held that the president of the corporation, who was in this state in connection with such action, was not amenable to service (upon the corporation) in a malicious prosecution suit which was necessarily based upon and dependent upon the result in the very action which was being prosecuted by the foreign corporation. The opinion points out, 295 S.W.2d, loc. cit. 91, that transactions by a foreign corporation which are merely incidental to the corporation's ordinary business and do not amount to any essential or substantial part of that ordinary business do not subject it to personal service in that state; and that to make a foreign corporation amenable to service it is required that it be engaged in transacting

some substantial part of its usual and ordinary business in this state.

We are not here concerned with a single or isolated act or transaction but, under the facts, with a continuous course of business. It is our conclusion and we hold, as held in the International Shoe and Trimont cases, supra, that appellant was amenable to personal service of process in the instant action.

But appellant contends that even if it was "doing business" in Missouri so as to subject it to the jurisdiction of the Scott County Circuit Court, the attempted service did not subject appellant to that jurisdiction because Vocke "was a manufacturer's representative only, and was not an 'agent' upon whom service could have been had."

■■■ Supreme Court Rule 54.06(c), V. A.M.R. provides, in material part, that service may be had on a domestic or foreign corporation "by delivering a copy of the summons and of the petition to an officer, partner, or a managing or general agent, or by leaving the copies at any business office of the defendant with the person having charge thereof * * *." The fact that Vocke was a "manufacturer's representative" did not prevent him from also being the kind of an agent described in the rule. The evidence heretofore reviewed clearly indicates that Vocke was an agent through whom appellant was "doing business" in this state. It was Vocke who set up the distributors and dealers. It was Vocke who promoted sales by those distributors and dealers and who received the orders from those distributors and dealers and sent them to St. Louis or Pennsylvania to be filled, or arranged for such orders to be sent to one of those places by the distributors and dealers. And it was Vocke who was in sole charge of appellant's advertised branch office.

The case of Higham v. Iowa State Travelers Association, 8 Cir., 183 F. 845, cited by appellant in support of its contention in this respect, held that service could not be had on a foreign accident insurance company by leaving a copy of the summons and complaint with a physician who was connected with the company only to the extent that he was employed in isolated cases to report on the condition of injured policyholders and paid a physician's fee therefor. The Missouri statute, R.S. 1889, Sec. 7992, provided that service could be made on a foreign accident insurance company by delivering a copy of the summons and complaint to any person within the state who solicited insurance on behalf of the corporation or who made a contract of insurance or who received the premium for insurance or who adjusted or settled the loss or paid the same for such insurance corporation, or in any manner aided or assisted in doing either. The court was of the opinion that the agency of the doctor was casual and of temporary character and that he carried on no activity for the company of a continuous nature as opposed to mere casual transactions. That case does not support appellant's contention herein where the evidence shows that Vocke carried on continuous activity for Caloric in the prosecution of its business of selling its products.

■■■ Appellant also contends that the sheriff's amended return shows on its face "that service was not proper or sufficient to subject this defendant to the jurisdiction of the Circuit Court of Scott County." The amended return recited that process was served "by delivering, on the 15th day of July, 1960, a copy of the summons and copy of the petition as furnished by the Clerk to Walter L. Vocke, Agent of the within named corporation." Appellant insists (1) that inasmuch as the amended return merely described Vocke as an "agent" it was not sufficient to meet the requirements of Rule 54.06(c), supra, in that it did not indicate where Vocke was served, whether he was in charge of an office, nor in any other way qualify him as having sufficient capacity to accept service; and (2) that inasmuch as the amended return simply described Vocke as "Agent of the within named corporation"

and did not describe him as a managing or general agent, and did not indicate that the copies were left with the person having charge of appellant's business office, it was insufficient. In support of those contentions, appellant cites Litzinger v. Pulitzer Publishing Co., Mo., 356 S.W.2d 81, 87–88. That case was ruled upon *timely* filed motion based specifically upon the provisions of Rule 54.06(c) and proof adduced in support thereof. That is not the situation here presented. Prior to verdict and judgment in this case, appellant never at any time challenged the *sufficiency of the recitals of the return* as measured by the provisions of Rule 54.06(c).

The transcript reveals that following filing of the sheriff's return of service, appellant filed its "Amended motion to quash the summons and the service thereon or, in the alternative, to dismiss this said cause as it pertains to the Caloric Appliance Corporation, * * *." That motion alleged: (1) that Caloric, a foreign corporation, had not done business in Missouri so as to subject it to jurisdiction of the courts of this state; (2) that it was not licensed to do business in Missouri and had no registered agent; (3) that it had not maintained a place of business in Missouri which would constitute a basis of jurisdiction of the courts of this state or service of process in this state; (4) with respect to the amended return, Caloric alleged *only* that the service on Vocke was not good service on it because Vocke at the time was not "the Registered Agent or *an Agent* of this said defendant"; and (5) that to assert jurisdiction would violate due process.

Appellant's motion for directed verdict filed at the close of all of the evidence, insofar as it relates to the trial court's jurisdiction of appellant, avers: "That this Court does not have jurisdiction over the defendant, said defendant not being a resident of the State of Missouri, and is not qualified as being authorized to transact business in the State of Missouri, and not having transacted business in the State of Missouri so as to afford the Courts of the State of Missouri jurisdiction over said defendant."

Appellant's after-trial motion to set aside the verdict and to enter judgment for appellant or, in the alternative, for a new trial, incorporates by reference the allegations of the foregoing motions and again asserts " * * * relative to the lack of jurisdiction of this Court over the defendant, which said lack of jurisdiction is based upon the non-residence of the defendant, which is a foreign corporation, and which is not licensed and has never been licensed to transact business in the State of Missouri, and which has not, in fact, conducted or transacted business within the State of Missouri in the sense that it would thereby be subjected to the jurisdiction of the Courts of the State of Missouri, and that any sales made or the delivery of merchandise made by the defendant in the State of Missouri constituted interstate commerce and not the transaction of business within the State of Missouri." And then, *for the first time,* appellant asserts that "service of process in this said cause was not had upon any agent or representative of the defendant at any office or place of business owned, controlled or operated by the defendant."

Thus, it is seen that prior to trial, verdict and judgment, appellant's only contentions were, as stated, that appellant was denied its constitutional right of due process on grounds (1) it had no place of business in Missouri such as would constitute a basis for jurisdiction of the courts of this state of the instant action or for service of process upon it; and (2) that Vocke was not its agent. Yet, as we have determined from the evidence adduced by appellant in behalf of those contentions, it did have such a business office at 1607 Thrush in St. Louis County and that Vocke was its agent and as such was in charge of its business. It is obvious, of course, from the facts as we have found them, that if the insufficiency of the return measured by the requirements of Rule 54.06(c) had been challenged prior

to trial the return could have been properly amended so as to conform to the rule. We are constrained, therefore, to hold that where it appears, as here, that prior to trial, verdict and judgment, appellant questioned the trial court's jurisdiction over it only upon two specifically pleaded grounds, (1) that appellant had no office in this state for the regular conduct of its general business and (2) that Vocke was not its agent, appellant must be held to have waived any defect or insufficiency shown upon the face of the return. See S.Ct. Rules 55.31, 55.36 and 55.37.

■ The stove which Mrs. Morrow purchased from dealer H. L. Lewis at East Prairie was a regular 36″ gas range with four burners and an oven and was sold to Mrs. Morrow to be used by her for household cooking. Mr. Lewis purchased it from Caloric's distributor, Uregas Company at Cape Girardeau. The invoice evidencing that sale was dated June 18, 1959.[1] The range in question was manufactured by Caloric Appliance Corporation on April 3.

Mr. Lewis's employee and service man, Bill Summerlott, uncrated the range sometime in July and thereafter, upon being informed that it was sold, "checked it out", which consisted of making necessary adjustments to see that each burner received air and gas properly, that there were no leaks, that there was a proper minimum and maximum blaze, and to make certain that everything was in perfect working order. The stove "checked out perfect". Thereafter, Summerlott and Mr. Lewis's son delivered the range to the Morrow residence, removed the old stove, connected the new one to the gas supply, and Summerlott again went through the routine of checking the burners, checking for leaks, checking all connections, and checking the pressure on the gas line supplying the gas to the house. He found everything in proper order, showed Mrs. Morrow how to operate the stove and left.

Mr. Lewis furnished the tanks (located outside the house) which contained the propane gas used at the Morrow residence and he owned the regulator which was fastened to the propane gas cylinder which was for the purpose of reducing the pressure, which in a 100-pound container at sixty degrees is under 100-pound pressure per square inch, to a pressure of six ounces per square inch.

Mrs. Morrow used the stove for cooking for five or six days until the 11th or 12th of August. That day she lit the right front burner and placed thereon a pan containing tomatoes. She turned away from the stove, shortly thereafter heard a hissing noise, looked back, and saw flames coming up around and over the pan. She turned off the burner, removed the pan, noted that the pilot light for the two right-hand burners was still burning and turned the front burner on again, whereupon flames shot almost to the ceiling. She then turned the burner off but the flaming did not stop, so she ran outside and disconnected the gas at the tank.

Mr. Summerlott examined the stove the next morning. He found the knobs were burned off the two right-hand valves. The valves were the mechanisms by which the burners were turned on and off. He took those valves apart and found that they had been hot, that they were "charred" inside and there was not any packing grease or lubrication in them; it had burned out and there was char inside. He said he "cleaned them and repacked them with valve packing grease" and got the char out of them. Packing grease serves not only as lubrication but also keeps a valve from leaking. If a stove is burning when gas leaks from it, the valve which does not have packing grease in it will catch on fire. If it gets too hot the grease would disintegrate. Summerlott then replaced the valves, turned on the gas supply, checked the pressure of the gas reaching the stove and checked for leaks and found none. He testified that if

1. All dates hereinafter mentioned are in 1959 unless otherwise noted.

it were assumed that the range caught fire on the right-hand side and blazed up and burned enough to char the knobs on the right-hand side, in his opinion the only thing that could have caused the fire was the valve.

Mrs. Romanowski, the Morrow's married daughter, (and her child) were living with her parents at the time of the delivery of the stove and the events thereafter. After Summerlott had repaired the stove, Mrs. Morrow continued to use it for a period of four or five days. She then went to Alabama to join her husband and left her daughter in charge of the house and the other ten Morrow children then living there. Mrs. Romanowski had witnessed the incident involving the August 11th or 12th fire and, after the stove had been repaired, helped with the cooking until her mother left for Alabama and thereafter Mrs. Romanowski used the stove until the time of a second fire. It worked satisfactorily and, although she had a good sense of smell, she smelled no gas at any time while using the stove. She testified that on August 18 she placed a frying pan with lard in it on the left front burner which she had turned on and which burned with a blue flame. Thereafter, she put some potatoes in the pan, covered it with a lid, and left the room to check some clothing for one of her sisters. A few moments later she smelled something burning and went to the kitchen and saw that the whole left side of the stove was on fire. She heard the same hissing sound she had heard before when the right front burner was on fire. The wallpaper was on fire and she was concerned about the safety of her brothers and sisters. By the time she got them out of the house it was too late to remove any personalty before the house was completely destroyed.

At the time of the trial Summerlott was working for a gas company, servicing appliances and delivering fuel. Theretofore, he had worked seven years for Mr. Lewis delivering appliances and servicing them.

He had repaired gas appliances and gas ranges, including Caloric gas ranges and the valves thereon, was familiar with them and knew how they operated. He was asked the following hypothetical question and gave the following answer:

"Q. Mr. Summerlott, assuming the following facts: that on August the 18th, 1959, one week after you had checked and repaired the stove in question which had been on fire, Mrs. Romanowski who was the daughter of Mr. and Mrs. Morrow went into the kitchen and in preparation of cooking supper lit the left front burner on said stove, that the pilot light was burning at that time, that the burner lit immediately and burned properly, that Mrs. Romanowski placed a skillet containing lard on the burner to heat, that while the lard was heating she sliced some potatoes and placed them in the skillet after the lard became hot, that this consumed about two minutes, that the stove was still operating properly with the proper type of blue blaze, that she left the room to go into another part of the house, that in about two minutes she smelled something burning and returned to the kitchen, that the stove at that time was making a hissing noise, that the whole left side of the stove was blazing, that flames were coming out all over the stove and that the paper and wall back of the stove and to the side of the stove was on fire, do you have an opinion as to what caused the stove to act as it did and as to what caused the fire?

\* \* \* \* \*

"A. In my opinion it was faulty valves. It was the only thing that could have leaked from what she did."

Summerlott testified further that the regulator which was attached to the propane gas cylinder was so constructed that if anything went wrong with it an air vent in the bottom would let the gas go out into the open and not into the stove.

Mr. William B. Thomas, director of service for Caloric, and appellant's witness, testified that the valves used in the range in question were purchased from another company and that they arrived at the Caloric factory fully assembled; that Caloric's employees did not disassemble them; that if the grease in a valve becomes dry it could make the valve defective and it might leak; and that Caloric manufactured approximately 200,000 stoves a year on an assembly-line basis.

We are convinced and hold that the evidence, viewed in the light most favorable to respondents, was sufficient to support a finding that the fire and resultant loss of personal property were direct results of defective valves, an integral part of the Caloric range, and which defect (or its cause) was present when it left the manufacturer's hands. Appellant's contention that the evidence is as consistent with its theory that the fire was a result of a defect in or malfunction of the regulator owned by Lewis or the result of the negligence of Mr. Summerlott in improperly repairing or adjusting is not compelled by the evidence and, in fact, appellant's brief contains no argument in support of the assertion so made.

The precise question now presented to *this court* (for the first time, insofar as we have found) is whether privity of contract is necessary in order for an ultimate consumer to recover from a manufacturer on an implied warranty or, perhaps stated more frankly, whether a manufacturer of an instrumentality which is imminently dangerous if defectively manufactured is to be held to strict liability upon proof of the defect and of causation.

Appellant's basic contention in that respect is, as stated in its brief:

"It is submitted, some essayists to the contrary, that the overwhelming weight of the judicial decisions in the State of Missouri, and in the Federal Courts, construing the law of Missouri on the issues here involved, hold that in the absence of privity there can be no recovery by a retail customer for (from?) the manufacturer on the theory of implied warranty of fitness.

"The Supreme Court en banc in the case of State ex rel. Jones Store Co. v. Shain, [352 Mo. 630] 179 S.W.2d 19, l. c. 21–22, so held. This appears to have been the latest case as far as the Supreme Court is concerned, but its pronouncement in this case is consistent with the cases decided by the Court on the same issue on previous occasions."

The Jones case (1944) was a proceeding in certiorari to review the decision of the Kansas City Court of Appeals in Marra v. Jones Store Co., 170 S.W.2d 441, to determine whether it conflicted with prior decisions of this court insofar as the Kansas City Court of Appeals held that there was in fact an implied warranty of suitability. In the Jones case there was *no question of privity. Privity existed* because the suit was by a purchaser of a satin blouse from defendant in the defendant's store. The sole question passed on in the case was whether there was an implied warranty as between the immediate vendor and purchaser. The court in the Jones case specifically stated that "it should be noted that it appears * * * that the relator was not the manufacturer or producer of the article sold to the plaintiff, but was a retailer." The result in the Jones case depended entirely upon whether the retailer undertook to furnish the blouse *for a special purpose or use as distinguished from the ordinary use* of the article in question, the court pointing out that if it was for an ordinary use, then no warranty on the part of the retailer was implied, under our prior decisions. The court proceeded to hold that the intended use by plaintiff of which retailer had knowledge was not a special use except, perhaps, as to the fact that the blouse would fit plaintiff, but that it was not a special use which would support an implied warranty that the blouse contained no harmful ingredients.

The only Supreme Court case found that purports to apply the rule of the Jones case was Zesch v. Abrasive Company of Philadelphia, 353 Mo. 558, 183 S.W.2d 140, 143 [3], 156 A.L.R. 469, where Judge Van Osdol, in dealing with a *vendor-vendee situation where privity of contract existed,* said that there was no evidence showing that the cutting wheel in that case was furnished for a *particular special purpose, as distinguished from the ordinary use of the wheel* and, upon the authority of the Jones case, there was thus no implied warranty of suitability of the article sold. There was no question of *privity* present in the case.

■ It is true, as pointed out in appellant's brief, that the federal courts in Missouri and the 8th Cir. U.S.C.A. have from time to time, in attempting to determine what the Missouri law as to implied warranty is or would be, indicated that their research convinced them that Missouri limited or would limit recovery on implied warranty to food and drink products in the absence of privity of contract. Those cases, of course, are not binding upon this court and are to be considered only as to the extent they may shed light upon what the law of this state is or would be.

■ It is also true that certain Missouri courts of appeals cases have held that there is no warranty without privity of contract, such as Degouveia v. H. D. Lee Mercantile Co. (1936), 231 Mo.App. 447, 100 S.W.2d 336. But since that time the courts of appeals have held that the ultimate consumer may recover from the manufacturer or processor of food or drink, irrespective of the absence of privity of contract, and that recovery in such cases may be had on an implied warranty. See, for example, Helms v. General Baking Co. (1942), Mo.App., 164 S.W.2d 150; Williams v. Coca-Cola Bottling Co. (1955), Mo.App., 285 S.W.2d 53.

In Stewart v. Martin (1944), 353 Mo. 1, 181 S.W.2d 657, this court held that the operator of a cafeteria who sold unwholesome food (a ham sandwich) would be absolutely liable to the purchaser-consumer sustaining injury therefrom, which liability could not be avoided by proof of due care.

In Worley v. Proctor and Gamble Mfg. Co. (1952), 241 Mo.App. 1114, 253 S.W.2d 532, plaintiff sued to recover on the doctrine of implied warranty without privity of contract for injuries allegedly done to her skin by the use of "Tide", a detergent. She was denied recovery on the ground that she failed to show that "Tide" contained any ingredients or chemicals injurious to the skin of a normal person and that the burden was upon her to bring herself within the class contemplated by the warranty in such cases. In holding that plaintiff was entitled to invoke the theory of implied warranty, as above limited, without privity of contract, the opinion noted (with citation of authorities) that, originally sounding in tort, a warranty was regarded in the nature of an action on case for deceit and that thereafter, for convenience not here material, the doctrine of assumpsit was employed, which required privity of contract; that exceptions had long since been made to the rigidity of the latter doctrine as to foods, beverages and drugs; and that the courts of several of the states had extended the foregoing exceptions to other articles likely to produce physical injury if improperly manufactured or which contained elements injurious to health. The opinion then states, loc. cit. 536–537:

"But, whatever may have been the justification for the adoption of the requirement in question, there is no good reason why the courts cannot re-examine the nature of a warranty and determine whether in all cases a relationship of sale or contract is a prerequisite to its existence and, in the interest of social justice, reshape the law to conform to the requirements of modern economic life.

"The necessities of logic do not require that we disregard legal history,

which refutes the oft repeated statement that a warranty is necessarily a contractual obligation, and follow decisions which have imposed arbitrary limitations resting upon convenience, or consideration of policy not applicable at the present time.

"Under modern conditions of retail merchandising, and the employment of widespread advertising, representations are, in fact, made to the consuming public. Thus, the legend 'Tide is kind to your hands' is not directed to the retail dealer—a mere conduit through which goods are distributed to the consuming public—but to the housewife, who is always solicitous of the condition of her hands. In such a situation, it would be in keeping with the realities of modern economic life to recognize the applicability of the principles of warranty as governing in a contest between the ultimate consumer and the party making such representations."

In Smith v. Ford Motor Company (1959), 327 S.W.2d 535, the St. Louis Court of Appeals considered the question of the liability of the manufacturer of an automobile purchased by plaintiff from the manufacturer's dealer. In that action plaintiff sought to recover under the theory of implied warranty for damages sustained by reason of the general unfitness of the automobile and numerous pieces of its equipment for use, resulting in large outlays for replacement, repairs, etc. There the court, after citing its earlier decision in the Worley case, supra, and cases from other states, held that the manufacturer was not to be held liable under the theory of implied warranty, saying, loc. cit. 538: "In these cases where recovery has been allowed upon an implied warranty to the purchaser there has been an injury and an element of tort present as recognized in the Worley case. It is to such situations that an implied warranty to the ultimate purchaser may be relied upon. Dotson v. International

Harvester Company, 365 Mo. 625, 285 S.W.2d 585; Dennis v. Willys-Overland Motors, D.C., 111 F.Supp. 875; Turner v. Edison Storage Battery Co., 248 N.Y. 73, 161 N.E. 423." But, in the case of Midwest Game Co. v. M. F. A. Milling Co. (1959), 320 S.W.2d 547, this court held, loc. cit. 550, that the rule that the sale of food for human consumption carried with it an implied warranty that it was wholesome and fit for consumption *should at least be extended* to food for consumption by animals (fish) "where the food is not in its raw state but has been processed and packaged by the manufacturer." And, more recently, in Albers Milling Co. v. Carney (1960), 341 S.W.2d 117, this court likewise held, loc. cit. 120, that plaintiff, the manufacturer, by processing and furnishing the feed in question in sealed bags for use as turkey feed impliedly warranted that it "was wholesome and fit for use as turkey feed."

Several of the cases above cited suffice to demonstrate that the courts of this state have not found it necessary to adhere strictly to the rule of privity of contract as a prerequisite to recovery under the theory of implied warranty when to deny recovery has shocked their sense of justice. Research also shows that over the years the courts of many of the states have considered and, with varying degrees of forthrightness, applied the rule of implied warranty without privity of contract (in effect, strict liability) to the manufacturers of products which have caused injury to persons and property by reason of defects in construction or assemblage, which rendered such products imminently dangerous when used for the purpose for which they were manufactured and sold on the market to the "consumer" or user. Space will not permit of an extended discussion of the development of that doctrine and the impelling reasons upon which it is based. A recent and well-documented article, titled "Implied Warranties—The Privity Rule and Strict Liability—The Non-Food Cases", by Ross T. Roberts, appears in 27 Mo.Law Rev., No. 2, pp. 194–223. See also a more recent and

extended discussion by Walter H. E. Jaeger, appearing in the Spring 1963 Duquesne U. Law Rev., Vol. 1, pp. 1–142, and especially the conclusion therein reached, loc. cit. 141–142.

The case of Henningsen and wife v. Bloomfield Motors, Inc., and Chrysler Corporation, 32 N.J. 358, 161 A.2d 69, decided in 1960, has been cited with approval in several recent cases. There, after Mr. and Mrs. Henningsen viewed a Plymouth automobile for sale at the premises of Chrysler's agent, Mr. Henningsen purchased it and gave it to his wife. It operated normally during the next succeeding ten days so far as the Henningsens could tell. While Mrs. Henningsen was driving it in a normal fashion on a smooth highway ten days after delivery, the steering wheel and the front wheels of the car "went into the bizarre action" more fully described in the testimony in the case, the steering wheel spun in her hands, the car veered sharply to the right and crashed into a highway sign and a brick wall. Mrs. Henningsen received severe injuries and the car was damaged. The court said there was nothing in the proof to indicate that the unusual action of the steering wheel was caused by Mrs. Henningsen's operation or by the use of the car between delivery and the happening of the accident.

The cause as to Mrs. Henningsen was submitted on the theory of implied warranty without privity of contract as to the manufacturer and as to Mr. Henningsen for the property damage to his automobile and other medical and hospital expenses and loss of his wife's society and services. Both recovered upon their respective claims against both defendants. Both defendants appealed. The judgments were affirmed. During the course of the opinion, the court said, 161 A.2d, loc. cit. 80–81, 83:

> "The limitations of privity in contracts for the sale of goods developed their place in the law when marketing conditions were simple, when maker and buyer frequently met face to face on an equal bargaining plane and when many of the products were relatively uncomplicated and conducive to inspection by a buyer competent to evaluate their quality. * * * With the advent of mass marketing, the manufacturer became remote from the purchaser, sales were accomplished through intermediaries, and the demand for the product was created by advertising media. In such an economy it became obvious that the consumer was the person being cultivated. Manifestly, the connotation of 'consumer' was broader than that of 'buyer.' He signified such a person who, in the reasonable contemplation of the parties to the sale, might be expected to use the product. Thus, where the commodities sold are such that if defectively manufactured they will be dangerous to life or limb, then society's interests can only be protected by eliminating the requirement of privity between the maker and his dealers and the reasonably expected ultimate consumer. In that way the burden of losses consequent upon use of defective articles is borne by those who are in a position to either control the danger or make an equitable distribution of the losses when they do occur.

> * * * * *

> "We see no rational doctrinal basis for differentiating between a fly in a bottle of beverage and a defective automobile. The unwholesome beverage may bring illness to one person, the defective car, with its great potentiality for harm to the driver, occupants, and others, demands even less adherence to the narrow barrier of privity."

To the latter observation, it may pertinently be added, we think, that there can be no rational doctrinal basis for differentiating between the fly in the beverage bottle, the defective automobile, the defectively processed food for animals, and an imminently dangerous defective gas cooking range manufactured and sold by the

manufacturer to dealers for sale to the public for use in the family home.

Another recent case, Greenman v. Yuba Power Products, Inc., (1962), 27 Cal.Rptr. 697, 377 P.2d 897, applied the doctrine to a power tool, saying, loc. cit. 901: "Implicit in the machine's presence on the market, however, was a representation that it would safely do the jobs for which it was built. Under these circumstances, it should not be controlling whether plaintiff selected the machine because of the statements in the brochure, or because of the machine's own appearance of excellence that belied the defect lurking beneath the surface, or because he merely assumed that it would safely do the jobs it was built to do. It should not be controlling whether the details of the sales from manufacturer to retailer and from retailer to plaintiff's wife were such that one or more of the implied warranties of the sales act arose. (Civ.Code, § 1735.) 'The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales.' (Ketterer v. Armour & Co., D.C., 200 F. 322, 323; Klein v. Duchess Sandwich Co., 14 Cal.2d 272, 282, 93 P.2d 799.) To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use."

Other recent cases which applied the rules here under consideration are: Goldberg v. Kollsman Instrument Corp. (1963), 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81, involving an airplane equipped with a defective altimeter; State Farm Mutual Ins. Co. v. Anderson-Weber, Inc. (1961), 252 Iowa 1289, 110 N.W.2d 449, involving property loss sustained by the purchaser of an automobile (and his subrogated insurance carrier) by reason of defective manufacture of or assemblage of the electrical wiring in the automobile, which caused it to become on fire, thereby damaging it; 50 New Walden, Inc. v. Federal Insurance Co. (1963), 39 Misc.2d 460, 241 N.Y.S.2d 128, which held that building owner could sue, on implied warranty theory, manufacturers whom general contractor engaged to design, fabricate, erect and install trusses and roofs which collapsed to owner's damage.

Careful consideration of the recent decisions of the courts of other states to the same effect, the inclination of the courts of this state to modify the harsh results flowing from a rule of *caveat emptor* in analogous fact situations, the logic of the reasoning upon which these cases (and numerous other cases therein cited) are ruled in an effort to afford justice to the vast majority of the "consumer" citizenry, whose well-being, health and very lives are dependent in great degree upon processed food and manufactured articles and facilities, the fitness or safe use of which the ordinary "consumer" can know little or nothing other than the fact that the processor or manufacturer holds them out to the public as fit and reasonably safe for use by the "consumer" when used in the manner and for the purpose for which they are manufactured and sold, lead inevitably to the conclusion that under the facts as found by the jury the appellant is to be held liable as an implied warrantor of the fitness and reasonable safety of the gas cooking range here involved, despite lack of privity of contract.

■ Appellant next contends that Instruction No. 1 is prejudicially erroneous on grounds that the doctrine of implied warranty does not apply to the fact situation in the instant case; that the abstract statement in the first paragraph was a misstatement of the law as it pertained to the facts; that the evidence was not sufficient to support a finding in favor of respondents; that the evidence did not show the stove was purchased for the particular purpose for which it was manufactured; that there was no evidence to show it was in the same condition when it caused the fire to respondents' home as when manufactured; and

that no facts were set out as to the parts which were defective or malfunctioning. Instruction No. 1, in material part, reads:

"The Court instructs the jury that where a manufacturer undertakes to supply an article for a particular purpose, knowing that the buyer trusts to its judgment that the article is suitable for that purpose, there is an implied warranty by law that the article so manufactured and purchased is reasonably fit and suitable for that purpose.

"The Court further instructs the jury that if you find and believe from the evidence in this case that the defendant, Caloric Appliance Corporation was at the time mentioned in the evidence engaged in the manufacture and sale of Caloric gas ranges to be sold and used for domestic purposes; and if you further find and believe from the evidence that on or about the 7th day of August, 1959, the plaintiffs, for a valuable consideration, purchased the Caloric gas range described in the evidence, which had been so manufactured by the defendant, Caloric Appliance Corporation, if you so find, for their use and to be used by them for domestic purposes, and was placed by them in their dwelling house for that purpose; and that plaintiffs relied upon defendant's judgment that said Caloric gas range was reasonably fit and suitable to be used for said domestic purposes; and if you further find that on or about the 18th day of August, 1959, while plaintiffs were using said gas range for domestic purposes, and while it was in the same condition as when manufactured, sold and delivered to plaintiffs, that said gas range malfunctioned, improperly operated and extruded excessive flames therefrom, catching plaintiffs' dwelling house on fire; and if you further find from the evidence that said Caloric gas range so manufactured and sold to plaintiffs was not reasonably fit and suitable for its intended purpose, in that it was defective and improperly

manufactured and assembled, if you so find, and that as a direct result of such unfitness and unsuitability, if you so find, plaintiffs' dwelling house was caused to catch on fire, * * *", etc.

We are convinced and hold that conclusions herein reached, based upon the evidence and the law as herein declared controlling in disposing of the issue of submissibility of the case on the merits, show no prejudicial error in the giving of Instruction No. 1 in any of the respects alleged.

■ Appellant next contends that the court erred in refusing its Instructions Nos. D–1, D–2, D–3, D–4 and D–5. These instructions would have submitted to the jury the following briefly outlined hypothesized factual findings: D–1—If, after the gas stove was installed, it worked properly, respondents could not recover. D–2—If appellant exercised ordinary care in the manufacture or procurement of the stove or any of its parts and in the assembling of its parts and in inspecting and testing the stove after it was assembled, then appellant was not liable. D–3—If the stove did not properly function subsequent to delivery and respondents, in the exercise of ordinary care should have so known, but continued to use it, that in so doing they were negligent; and that their said negligence, if any, directly contributed to cause the fire, then appellant was not liable. D–4—If, at all times appellant had the stove in its possession, appellant was in the exercise of ordinary care, then respondents were not entitled to recover. D–5—No verdict could be returned in favor of respondents on grounds there was a breach of implied warranty.

All of the foregoing instructions submitted by appellant were predicated upon appellant's theory that respondents' case was submissible only upon proof and finding of negligence on the part of appellant. In view of our conclusion that the case was submissible under the theory of implied warranty without privity of contract, the trial court committed no error in refusing them.

Appellant, with reference to Instruction D–3 above outlined, does insist, however, that even if the court should conclude that it was proper to allow respondents to proceed on the theory of implied warranty, Instruction D–3 should have been given because they were charged with knowledge of the dangerous potentialities of the stove they had in their home, inasmuch as it had at one time caught on fire, and respondents should be charged with some responsibility for continued use of this stove; and that, as between the respondents and appellant, respondents had at their command the choice of whether to use or not to use the stove, whereas, at the given date and time, appellant had no control or choice as to whether or not the stove should be used by respondents or other parties.

 Assuming, without deciding and for the purpose of this opinion only, that a fact situation might be shown evidencing such negligence on the part of the user of a gas stove as to bar him from recovering under the theory of implied warranty, there is no evidence in this record justifying a finding that respondents became chargeable of knowledge of the "dangerous potentialities of the stove" by reason of any defect in its manufacture or assemblage. There is not the slightest fact or circumstance in the record showing or tending to show that they could have had such knowledge. The only inference deducible from the record in this case is that respondents knew when the first fire occurred that the stove was not functioning properly, called appellant's dealer whose service man came out and remedied the defects in the valve controlling the right burners; and that respondents, confident that it had been made safe, continued to use it. Certainly, respondents should not be required to anticipate that the valve controlling the left burners was also defective.

The judgment should be and is affirmed.

All concur, except HOLMAN, J., not sitting.