Ann NEWELL, Plaintiff-Appellant,

v.

Wharton L. PETERS, Defendant-Respondent.

No. 32154.

St. Louis Court of Appeals.

Missouri.

July 19, 1966.

Motion to Modify Opinion and Petition for Rehearing Denied Sept. 13, 1966.

J. Jules Brinkman, Richard M. Stout, St. Louis, for appellant.

F. Douglas O'Leary, M. E. Stokes, Moser, Marsalek, Carpenter, Cleary & Jaeckel, St. Louis, for respondent.

TOWNSEND, Commissioner.

Action for damages for injuries to person and property as the result of an intersection collision of automobiles. The case was submitted upon instructions permitting a verdict for plaintiff for primary negligence of defendant in failing to keep a vigilant and proper lookout and upon humanitarian negligence of defendant in failing to stop. Verdict for plaintiff for $4000 on account of personal injuries and for $250 on account of property damage. Defendant's motion for judgment in accordance with his motions for directed verdict was denied, but defendant's motion for a new trial was sustained as to the issue of liability only for reasons hereinafter stated. Plaintiff appeals from the order granting defendant a new trial. No appeal was taken by defendant.

Uncontradicted testimony by plaintiff and her witnesses was as follows:

On April 3, 1963, shortly before 9 A.M., plaintiff, driving her own car, was a participant in a funeral procession which was proceeding westwardly on Delmar Boulevard in the City of University City, with the lights of all cars turned on and with a funeral sticker on the windshield of each car. Plaintiff was in approximately the middle of the procession. A drizzle prevailed and plaintiff's windshield wipers were operating. Plaintiff estimated her speed as she approached the locale of the collision at about 25 miles per hour and stated that she did not diminish her speed as she entered the intersection. As the funeral procession reached the intersection of Delmar Boulevard and Old Bonhomme Road, a north and south street, all cars preceding plaintiff passed through the intersection without stopping. Plaintiff testified that for a "little ways" before she reached the intersection the traffic light there was red and that it was red as she entered the intersection. She did not know when it had become red against the procession, but another witness testified that the light was green when the head of the procession entered the intersection. At the location in question, there are five traffic lanes on Old Bonhomme north of the intersection—two for northbound traffic and three for traffic coming from the north; one of the latter is a left-turn lane.

Four witnesses testified that at the time of the collision two southbound cars were stopped side by side on Old Bonhomme on the north side of Delmar, one of which would have been in the left-turn lane. Defendant stated that there was but one car stopped—in the left-turn lane—on the north side of Delmar and that he traveled in the lane just to the right of the left-turn lane, that there was another lane to his right. Defendant further testified that from the time that he came into Old Bonhomme, about 200 feet north of Delmar, until he reached Delmar he saw no vehicles pass through the intersection from east to west.

It is uncontroverted that, with the green light in his favor, defendant proceeded into the intersection and there collided with plaintiff's car. Defendant stated that the middle of plaintiff's bumper struck his left front area over the left front wheel. Plaintiff was unclear as to points of impact as she did not see the cars after the collision. Plaintiff's petition pleaded excessive speed on the part of defendant, failure to maintain a vigilant lookout, failure to yield the right of way, and failure to sound horn. The petition recognized the existence of ordinances relating to signals and the electric traffic control of the intersection and even charged defendant with entering the intersection when the red electric signal was against his direction of travel.

Plaintiff also pleaded humanitarian negligence. Defendant's answer, after admitting the mere fact of the accident, denies all other of plaintiff's allegations and pleaded the contributory negligence of the plaintiff.

In its order sustaining defendant's motion for a new trial the trial court rested its action on two of defendant's specifications of error, namely, that

"a. Plaintiff was not entitled to an instruction submitting primary negligence on the part of defendant for the reason that she was guilty of contributory negligence as a matter of law in entering and crossing the intersection mentioned in evidence in violation of a traffic signal, as admitted in her own testimony.

b. Said instruction is misleading in that it inferentially gives the jury permission to find an automobile in a funeral procession may disregard traffic signals"

and in addition held that the Court erred in refusing defendant's instruction A which in effect stated that the operator of a vehicle moving in a funeral procession shall not proceed against a traffic signal controlling an intersection and that if plaintiff did so plaintiff is not entitled to recover under a verdict directing primary negligence instruction.

The meaning and purpose of a red electric traffic control signal is self-evident: the respect almost invariably accorded to it sufficiently attests—if any evidence were needed—that the motoring public has a full and complete awareness of its significance. The steady red light is not merely a warning, advising the motorist to be watchful and ever on the alert; it addresses itself to him in compelling language. Its command to him is imperious: "Do not proceed!"

And so we come to the crucial question here: Is the vigor of that restraint in any degree abated by the fact that the relative motorist is operating his vehicle as part of a funeral procession? Plaintiff is of the opinion that there are no Missouri precedents in point and research has disclosed none. Plaintiff would have us regard the instant case as governed by a custom, allegedly universal, that an automobile will stop to allow a funeral procession to cross and not proceed through the procession until the last car has passed, and in support thereof cites us to one Illinois case. We fail to perceive the relevancy of custom for reasons hereinafter stated.

There is before us no evidence of the custom and we venture the opinion that it would be difficult to disregard locale and time and so to establish such a universal custom. Testimony to which plaintiff refers in her brief does no more than state the expectations of the individual witness. Hence there is no basis for the suggestion which plaintiff makes, namely, that this Court "could, and should take judicial notice of this custom".

However it is clear that the custom contended for, even if it could be established by appropriate evidence, is not here relevant. From the alleged custom as stated by plaintiff, it is no doubt intended that the Court shall necessarily draw the corollary that vehicles in a funeral procession have a customary privilege of ignoring traffic signals. Can such a privilege exist in the face of legislative command that a vehicle shall not proceed through a red light? Obviously positive legislation overrides any inconsistent custom. Otherwise those to whom the law-making power is entrusted could find their functions emasculated. It is all simply a question of where that power resides—in the duly designated organ of society or in unorganized groups of inhabitants. The answer is not difficult.

We are not here confronted with an emergency situation where a sudden change of conditions renders it physically impossible for a motorist to honor the order transmitted by the light. That volition placed plaintiff in the position in which she found herself is well demonstrated by the "information" which she volunteered in the course of her testimony:

"Q. Now when you came up to that intersection, did you slow any from 25 miles per hour, by applying your brakes to sort of look around and see what would be coming?

A. No, I don't think I did. *A funeral procession has the right-of-way.*" (Our emphasis).

There is no state legislation which permits the motorist generally to ignore the red light. The legislature has enacted specialized legislation conferring upon the drivers of named vehicles a limited and conditional privilege of departing from certain stated standards of care. By Section 304.022 it is provided: "The driver of an emergency vehicle may * * * (b) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation * * *." The section defines an "emergency vehicle" with careful particularity. That definition does not comprehend a vehicle participating in a funeral procession. Plaintiff's contention would in effect add a new category of emergency vehicles to those enumerated in the statute.

Nor is it possible to accept plaintiff's attempted analogy of the instant case to the Stop Sign cases and particularly to Rodenkirch v. Nemnich, Mo.App., 168 S.W. 2d 977, upon which plaintiff relies. The rationale of the latter case is made clear by the following portion of the opinion: "* * * at the time of the occurrence in question there was no statute requiring persons operating motor vehicles at that point on Old Florissant road to stop in obedience to said sign. *The State Highway Department, by erecting such signs at highway intersections, cannot create a standard of conduct for drivers of motor vehicles,* violation of which the courts must declare to be negligence regardless of all other facts and circumstances." (168 S.W.2d at p. 979). (Our emphasis). Here the plaintiff has pleaded the existence of ordinances relating to "the electric traffic signal controlling the approach and movement * * * of traffic into said intersection"; hence there was here clearly admitted legislative creation of a standard of conduct for motorists which serves to differentiate the present case from that upon which plaintiff relies.

Plaintiff would have us believe that the rule that a motorist cannot achieve

a complete immunity by "relying absolutely upon a favorable green light" carries with it as a necessary concomitant the proposition that a motorist burdened by a red light cannot be declared guilty of negligence as a matter of law for violation of the red signal. This suggestion cannot be accepted. We know of no process of reasoning by which the latter proposition can be derived from the former. The motorist with the green light in his favor who drives into an intersection without maintaining a proper lookout can scarcely be equated to the motorist who, seeing the red light against him, nevertheless chooses deliberately to ignore it. In the latter case the duty to honor the command of the red light is a duty "unmixed with the exercise of judgment" (see Lincoln v. Railway Express Agency, Inc., Mo., 359 S.W.2d 759, at p. 766). It is a duty in no way here qualified by circumstances of emergency or of impossibility. It is a duty whose rigor is intensified by the motorist's ever-present knowledge that others rely for their safety upon his obedience to the command of the light.

It must be held that plaintiff's conduct constituted contributory negligence as a matter of law.

The matter of humanitarian negligence remains to be considered. We review the procedural steps followed. The case was submitted to the jury under both primary negligence and humanitarian negligence instructions. The jury returned a general verdict in favor of the plaintiff. Thereafter defendant filed the following motions: 1. To set aside the verdict and judgment and to enter judgment in favor of the defendant in accordance with his motions for directed verdict, on the grounds that the evidence wholly failed to establish any negligence on the part of defendant and wholly failed to establish that any conduct on the part of the defendant was the proximate cause of plaintiff's injuries; 2. To grant defendant a new trial. The latter motion complained of alleged errors

in giving (a) the primary negligence instruction, and, (b) in giving the humanitarian negligence instruction. The trial court did not rule on the motion for judgment in accordance with defendant's motions for directed verdict. (See Luethans v. Lahey, Mo.App., 237 S.W.2d 209). The trial court granted defendant's motion for a new trial on the issue as to liability only on the basis of defendant's specifications of error in the primary negligence instruction. The Court did not rule as to the alleged errors in the humanitarian negligence instruction. The order of the Court granting a new trial ordered that "the jury verdict as to the amount of damages be and is hereby held in abeyance until the conclusion of the retrial of the cause as to liability, and to be entered upon the verdict if found in favor of the plaintiff." Appeal was taken only by the plaintiff.

Where, as here, defendant's motions for directed verdict were preserved by an after-trial motion in the Circuit Court and plaintiff appeals from an order granting a new trial the reviewing court will at defendant's urging examine the evidence to determine whether or not plaintiff made a case for the jury. Schmittzehe v. City of Cape Girardeau, Mo., 327 S.W.2d 918; Wilhelm v. Haemmerle, Mo., 262 S.W.2d 609; Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73. If the "record plainly shows plaintiff under the law and the evidence cannot recover, the parties should be spared the trouble and expense of another trial." Bailey v. Interstate Airmotive, Inc., 358 Mo. 1121, 219 S.W.2d 333, 336, 8 A.L.R.2d 710; State ex rel. and to Use of Williams v. Feld Chevrolet, Inc., Mo.App., 403 S.W.2d 672 (May 17, 1966). And so an examination of the evidence is necessary for the purpose of determining whether plaintiff made a submissible case on humanitarian negligence.

The evidence is reviewed from a standpoint favorable to plaintiff; she is given the benefit of any part of the defendant's

evidence favorable to her which is not contradicted by her own testimony or contrary to her own fundamental theory of recovery. We disregard all defendant's evidence unfavorable to the plaintiff. Terminal Warehouses of St. Joseph, Inc. v. Reiners, Mo., 371 S.W.2d 311; Sperry v. Tracy Dodge-Plymouth Co., Mo., 344 S.W.2d 108; Brantley v. Couch, Mo.App., 383 S.W.2d 307.

Plaintiff had been proceeding in the procession at an even pace with no noticeable variation in the distance between her car and the next one ahead, which was from 18 to 20 feet in the lead. The funeral procession proceeded in the same lane of Delmar Boulevard throughout and there were no cars moving alongside the plaintiff. The light was green when the head of the procession entered the intersection and all cars preceding that of plaintiff passed through the intersection without stopping. When a motorist on Delmar was about a car length east of the intersection he could see north on Old Bonhomme for a distance of about 100 feet. When plaintiff approached the intersection and was at its edge she looked to her right but did not see beyond two cars that were stopped side by side in the Old Bonhomme southbound traffic lanes. The driver of the car behind that of plaintiff saw defendant's car approaching when the latter was behind the cars stopped on Old Bonhomme; at that time the witness was about 20 feet behind plaintiff's car and in the intersection. At the moment of plaintiff's first sight of defendant's car the distance from the front of her car to the closest point of defendant's car was 8 to 10 feet. She did not see defendant's car until just an instant before the collision—"it all happened so fast", * * * "just a fraction of a second before the impact." The car was "right at" her when she first observed it. Under the conditions then prevailing plaintiff could have stopped her car in a car and half length from a speed of 25 miles per hour. Plaintiff's car was almost across Old Bonhomme at the time of impact; at the point of impact the front of plaintiff's car had almost reached the extension of the west curb of Old Bonhomme. Defendant drove onto Old Bonhomme from a side street at a point about 200 feet north of the intersection and proceeded southwardly at 15 to 20 miles per hour. Defendant estimated his speed at the moment of impact at not over 15 miles an hour. When defendant first saw plaintiff's car it was approximately at the front of the car which was in the left-turn lane on Old Bonhomme facing south. As the defendant approached the Delmar intersection the only thing that obstructed his view of the intersection was the car sitting in the left-turn lane on Old Bonhomme; while he could not see through that car he could see across it. He could see on both sides of that stopped car from the point where he turned into Old Bonhomme. Normally when a motorist is 50 feet up Old Bonhomme from the intersection he can see "quite far east" on Delmar. While the car which was in the left-turn lane on Old Bonhomme obscured the view which defendant had to the east, it did not amount to total obstruction of the view.

At the intersection in question there are five traffic lanes on Old Bonhomme—two for northbound traffic and three for southbound. Each lane is 10–12 feet in width. Defendant was traveling in the extreme right (or curb) lane for southbound traffic. Plaintiff was traveling in the middle lane of three westbound lanes on Delmar.

Defendant's attack upon plaintiff's case concerns itself with the problem of the zone of imminent peril and with the question of defendant's ability to stop.

█ Throughout the whole period during which plaintiff was passing *into* the intersection and progressing to the point of collision the red light was against her and hence the green light was in favor of defendant. The distance traveled by plaintiff under the latter circumstances was over forty feet and while plaintiff was traversing this distance at 25 miles per hour defendant was approaching the intersection at

15–20 miles per hour. Guidelines for the determination of the zone of imminent peril were long since laid down. Thus, it was stated in Frandeka v. St. Louis Public Service Company, Mo., 234 S.W.2d 540, 547 that "This zone commences and the duty of a driver of a moving motor vehicle begins when he saw, or could have seen by the exercise of the highest degree of care, that the person approaching the path of his vehicle was oblivious to the danger and was intent on crossing his path * * *. It is his duty to act on reasonable appearances of obliviousness and at a time when action would be effective." Here, from the defendant's own testimony a jury could have found that defendant in the exercise of the highest degree of care could have seen plaintiff's car in the intersection with the apparent intention of proceeding through although the red light was against her, a fact of which defendant must have been aware since the light was in his favor. Thereby there would have been presented to defendant a reasonable appearance of plaintiff's obliviousness to danger. " * * * it is true that where obliviousness, or the reasonable appearance of obliviousness, is present the duty to act arises when there is a likelihood, i. e., a probability, of danger. In such case * * * it would be error to instruct the jury that 'likelihood of injury' would not constitute imminent peril." Borgman v. Crenshaw, Mo., 344 S.W.2d 134, 137.

 While a motorist who has the light in his favor is initially entitled to rely upon the assumption that cross-traffic will obey the order of an unfavorable light, such reliance ceases to be justified when he sees, or by the exercise of the highest degree of care, should see, that a crossing motorist is proceeding on a collision course in violation of the light's command. At that point the rule of humanitarian negligence comes into operation and for present purposes the initial question is: When does the crossing motorist reach a position of imminent danger? It could reasonably have been found by the jury that the defendant, warn-

ed by another car stopped in the other through southbound lane on Old Bonhomme and having the ability by the exercise of the highest degree of care to discern plaintiff's position in the intersection, should have realized that plaintiff was in peril *before* her auto had moved to a point one and one-half car lengths from the point of collision, a distance according to the evidence within which her car, moving at 25 miles per hour, could have been stopped. Teague v. Plaza Express Company, 354 Mo. 582, 190 S.W.2d 254. Defendant, by his testimony, could have stopped his car in less than a car length or not more than 20 feet. Accordingly, it was for the jury to determine whether defendant, by using the means available to him and by using the highest degree of care, could with reasonable safety have avoided injury to the plaintiff by stopping.

We look next to the defendant's argument relating to the evidence of defendant's ability to stop. One of plaintiff's witnesses testified that defendant was traveling "around 40" as he approached the intersection, "about a car and half back" from Delmar. There was no evidence of the distance within which defendant's car, traveling at such speed, could have been stopped. Therefore, says defendant, a basic element of plaintiff's humanitarian submission was lacking. Plaintiff counters that, under Harrell v. Berberich, 359 Mo. 551, 222 S.W.2d 733, plaintiff is not bound by the estimate of her witness and may advert to defendant's own testimony as to speed. Defendant estimated his speed at 15–20 miles per hour and testified that at 18 miles per hour he could stop his car with safety by emergency application of the brakes in less than the length of his car. Plaintiff did not testify as to the speed of defendant's car.

 The case of Harrell v. Berberich, supra, fully sustains the contention made by plaintiff; it makes clear that a plaintiff may have the benefit of defendant's testimony as to speed if it is not "completely at war with his own positive testimony and the theory of his case." This

holding of the Supreme Court was reiterated in McDonough v. St. Louis Public Service Company, Mo., 350 S.W.2d 739, where, after stating that a plaintiff is not conclusively bound by his own or his witnesses' estimates of time, speed or distance, the Court held that plaintiff was not conclusively bound by the unfavorable testimony of his bystander witness as to defendant's speed but was "entitled to draw upon the other more favorable figures given" by defendant's witnesses. In the latter case the Court also distinguished Fisher v. Gunn, Mo., 270 S.W.2d 869, relied upon by defendant, because in the latter, the Court held that plaintiff could not have the benefit of defendant's testimony as to speed since such testimony was at war with plaintiff's fundamental theory of the case—a theory of liability based upon speed itself. In the instant situation plaintiff's case was not tried on a theory of defendant's excessive speed. Here the matter of speed is pertinent only to the question of defendant's ability to stop and so to avert the collision. Accordingly, defendant's contention that a basic element of plaintiff's case in this respect was lacking must be rejected.

We find that plaintiff made a submissible case of humanitarian negligence.

Defendant complains that the verdict was excessive and has briefed the point. As the defendant is not here in the position of an appellant, that subject is not before the Court.

The order of the Circuit Court should be affirmed.

Judgment affirmed.

PER CURIAM:

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, judgment is affirmed.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.