Rose Burns **WILLIAMS**, Plaintiff-Respondent,

v.

**FORD MOTOR COMPANY**, a Corporation, and McMahon Ford Company, a Corporation, Defendants-Appellants.

No. 32329.

St. Louis Court of Appeals.

Missouri.

Dec. 20, 1966.

Motions for Rehearing or to Transfer to Supreme Court Denied
Jan. 17, 1967.

Application to Transfer Denied
March 13, 1967.

Robertson, DeVoto & Wieland, Leo C. DeVoto, Jr., St. Louis, for appellant Ford.

Melville A. Ochsner, St. Louis, for appellant McMahon.

Bahn & Saitz, Robert W. Saitz, St. Louis, for respondent.

CLEMENS, Commissioner.

This appeal by the defendant automobile manufacturer and retailer challenges the

sufficiency of plaintiff's evidence to make a case against them on her theory of implied warranty of fitness; they also challenge instructions given and refused.

■ Rose Burns Williams, a 24-year-old secretary, selected a new, black, 1961 Ford Thunderbird convertible from the defendant McMahon Ford Company's showroom. She paid about $4,000 for it. From the start there was trouble with the power steering. On the fourth day after McMahon delivered the car to her, Mrs. Williams was severely injured when she drove the car into a tree. This happened, she says, because the power steering mechanism failed to work. She sued both McMahon and the Ford Motor Company on the theory of implied warranty of fitness, and got a $15,000 verdict and judgment against both. In determining submissibility the evidence will be viewed favorably to plaintiff; she will be given the benefit of any part of the defendants' evidence favorable to her which is not contradicted by her own testimony or contrary to her own fundamental theory of recovery. We will disregard the defendants' evidence unfavorable to the plaintiff. Newell v. Peters, Mo.App., 406 S.W.2d 814 [8].

On February 1, 1961, defendant Ford Motor Company manufactured and thereafter delivered the Thunderbird to its St. Louis retail dealer, McMahon Ford Company. Plaintiff bought the car from McMahon on Friday, March 24, 1961, and on the same day McMahon's salesman Raymond Peto delivered it to plaintiff at her office. Peto went with Mrs. Williams on a trial drive. She drove around the block and they noticed the power steering was "tight" and made "a funny noise." Peto had first noticed this trouble while driving to Mrs. Williams' office to deliver the car; but he did not want to lose the sale, so he told her it was just because "the car was new" and "it would work itself out." Mrs. Williams had experience driving a 1960 Thunderbird owned by her fiancé (now her husband). They drove the new car on several short trips over the weekend. The steering trouble kept getting worse—it was noisy, it was tight and binding on turns, and after making turns it wouldn't come back straight: "You'd have to help it back."

Monday morning Mrs. Williams phoned Mr. Peto about McMahon's fixing the steering. Tuesday morning he got the car at her office and drove it to McMahon's shop. He again noted the steering trouble and reported it to McMahon's "service writer." At mid-afternoon Peto saw someone working on the car with the hood up. Later, he tried to drive it but "couldn't get it off the lot." Peto then complained to McMahon's service manager, Arnold Trummer, who immediately made some corrections under the hood and filled the steering unit with oil.

The transcript shows that defendants' mechanics and engineers verbosely described the steering assemblies in minute detail. Their testimony was illustrated by Ford's exhibits: the steering assemblies, a drawing and a chart. No doubt the jury was aided by these exhibits, but they have not been lodged here. The power steering system used on the 1961 Thunderbird was "full-power, 100% assist" and was described as an "integral power steering system," in that the hydraulic power system was enclosed in one unit with the steering gear box.

When the service order was written Tuesday morning, the car went to McMahon's mechanic Joe Schmader with orders from service manager Arnold Trummer to fix a leak in one of the two hydraulic power lines. Schmader found that leak and another one at the oil reservoir. It was after mechanic Schmader had fixed these leaks that Mr. Peto tried to drive the car and again complained to the service manager, Mr. Trummer. Trummer drove the car himself and found the steering mechanism was noisy, indicating that the fluid level was low and that there was air in the steering mechanism. His inspection also showed there was a leak in the housing of the steering gear.

This was caused by a break in a washer, which allowed the oil to escape when under its operating pressure of 750 pounds per square inch. The valve-sleeve locking screw, where the defective washer was found, is part of the mechanism that controls two ports that feed fluid to either side of a piston through the sleeve; this sleeve moves back and forth approximately 45/1000 of an inch in directing the flow of the fluid to one side or the other of the piston, depending on which way the steering wheel is turned. Trummer replaced the defective washer with one taken from the power steering mechanism of another Thunderbird. The oil was quite low, so the line was cleared and refilled.

Mr. Peto then delivered the car to Mrs. Williams at her office. Enroute, he noticed the power steering still did not respond properly on sharp turns, but he said nothing about it to Mrs. Williams. After work she drove ten blocks to her home in Webster Groves; she noticed that although the steering was easier it still bound on turns, and after making turns she would have to "help the wheels straighten out." Shortly after five o'clock she parked the car in the street near her home.

This street was narrow and parking was allowed only on one side. Mrs. Williams parked on the north side, headed east. Thus, the left side of her car was at the curb. About nine o'clock Mrs. Williams started to drive away. Just ahead of her was the entrance to a private driveway, and beyond that was another parked car, 15 to 20 feet in front of her. She drove forward and to the right, turning the wheels to clear the car parked ahead of her. As she cleared the parked car her estimated speed was 10–15 miles per hour. Mrs. Williams then tried to turn the wheels back to the left but they wouldn't turn. The last thing she remembered was "going for the brakes." The car continued across the street, jumped the curb, and hit a large tree 52 feet away from her starting point. Mrs. Williams regained consciousness in a hospital. Under direct and cross-examination Mrs. Williams described the incident with these answers:

"I got into the car and I started the motor. I put the car into drive and I turned the wheel to the right to clear the automobile in front of me and I started to accelerate and I couldn't turn the wheel back to the left."

" * * * and when I tried to steer the wheel back to the left to straighten my car, it wouldn't turn, it just kept going straight * * *."

"When I tried to turn it back to the left, it was just like it was locked into position."

"No, I could not turn it."

"Yes, it kept going straight because I could not turn the car any at all, so it just stayed in the same pattern that I had pulled out."

On its own initiative McMahon took charge of Mrs. Williams' car immediately after the collision, and hauled it to its garage. The steering linkage—the mechanism from the power steering unit out to the wheels—had been wrecked by the impact. McMahon's mechanics disconnected the steering wheel, steering column and the entire power steering assembly. McMahon's mechanics and a Ford technician made some tests; they found the power steering oil supply was between the "full" and "add" marks. This loss of oil was unexplained. Then, at Ford's request, McMahon shipped the disconnected parts to Ford at Detroit for further testing, which was done several months later. At time of trial McMahon still had the car and Ford still had the disconnected steering assemblies.

Ford's service department had published a shop manual for use by dealers and their mechanics in servicing 1961 Thunderbird automobiles. It had a table relating to trouble shooting problems of steering gears, and as one of the problems it described a symptom called "binding or poor recovery"

and listed possible causes for this symptom: "incorrect steering gear adjustment, binding steering linkage, incorrect front wheel alignment, insufficient pump pressure, valve spool binding or out of adjustment." The term "hard steering" was also used in the manual and its possible causes were listed: "front tire pressure low, incorrect front wheel alignment, incorrect steering gear adjustment, binding steering linkage, lack of lubrication, insufficient pump pressure, air in the system, faulty valve spool, obstruction within the steering gear."

Walter J. Been testified for Mrs. Williams. He had special training and experience in steering mechanisms, including the 1961 Thunderbird. He gave four reasons for failure of the wheels to turn:

"Q. (By Mr. Saitz) * * * Now, Mr. Been, based upon your experience in the field of alignment and steering in the past twenty years, do you have an opinion, based upon that experience and training, as to whether or not—of I should ask it this way, what the competent producing cause of this failure to respond to the operator's effort to turn the vehicle to the left would be?

\*   \*   \*   \*   \*   \*

"THE COURT: Mr. Been, I said you could give your opinion and then explain it. Let's have your opinion first. What was the producing cause of this?

"THE WITNESS: Very good. Well, what I am trying to do, Your Honor, I am trying to explain why wheel alignment—

"THE COURT: I am not asking you about wheel alignment. You said you could express an opinion as to the cause of this failure there and then if there is some explanation that is needed, you may make it.

"THE WITNESS: Your Honor, I believe there is four reasons for failure. One of them is loss of fluid. Two, loss of power. Three, malassembly in the

steering column itself. Four, maladjustment.

\*   \*   \*   \*   \*   \*

"Q. (By Mr. Saitz) Is that your answer, it would be one of any one of the four items?

"A. Any one of the four items.

"Q. All of which pertain to defective steering?

"A. That is correct."

Mr. Been had not inspected the parts held in the defendants' custody, so he had no way of knowing which of the four causes he enumerated had actually caused the failure of the steering wheel to respond. He also said it was necessary to adjust the steering mechanism when the wheels were perfectly centered, using tension guages; that if the tension was out of adjustment, fluid would have no place to escape and there would be a locking sensation and necessarily an inability to turn.

■ Defendants' testimony denied the severity of steering difficulties before the collision and gave the results of their observations and tests after they took possession of Mrs. Williams' car. The weight of this testimony was for the jury, not this court.

■ Ford and McMahon each contend the plaintiff did not make a case of implied warranty of fitness. They say her evidence failed to show a defect in the *steering mechanism* and that such a defect caused the collision. They point to plaintiff's only expert opinion, that of Mr. Been, and say the witness spoke only of possible rather than probable causes. His quoted testimony is inconclusive on this. But opinion evidence is not the only way of showing a defect in the steering mechanism: the existence of a defect may be inferred, just as negligence may be inferred, from circumstantial evidence. See Frumer and Friedman, Products Liability, § 12.03[9], and cases there cited. In the usual operation of

a new automobile, properly manufactured, it turns in the direction it is steered. The corollary is that if a new automobile is properly operated but does.not turn in the direction it is steered, then the automobile is not properly manufactured. Consider this in the context of all the evidence: (a) Ford's shop manual showed four ways that its steering mechanism could malfunction; (b) from the time the car first left Mc-Mahon's to the time of injury, the steering mechanism did not operate properly; (c) under normal operation of the car by Mrs. Williams, the steering mechanism did fail to operate and the car went out of control —this within four days of delivery and four hours of re-delivery of the car to Mrs. Williams; and (d) McMahon and Ford had exclusive possession of the steering mechanism after the collision. From all this a jury could logically conclude that from the time Ford delivered the car to McMahon until the moment of impact, there was a defect in the steering mechanism; and that the defect caused her to run into the tree.

Furthermore, by this argument about a precise defect in the steering mechanism, the defendants overlook the gist of Mrs. Williams' complaint: that Ford and Mc-Mahon had warranted the fitness of the Thunderbird. True, she tried to show the car's unfitness by describing the steering mechanism and its probable defect; but her real complaint was that the Thunderbird itself—the defendants' product—was unfit for normal use.

■ The defendants' liability for a defective product can no longer be measured by the principles of negligence and privity, nor by the intricate law of sales. It is to be measured by the principle of strict liability for breach of warranty of fitness. Notice § 402A, 2 Restatement of Torts 2d (1965):

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

In the case of Morrow v. Caloric Appliance Corp., Mo. (banc), 372 S.W.2d 41 [6–8], Missouri extended the doctrine of strict liability for implied warranty to non-food cases. It was applied to a case against the maker of a gas stove that caught fire because of defective valves, without a showing of *how* the valves were defective. The court held that where an instrument is imminently dangerous if defectively manufactured, the maker is liable for injuries upon proof of a defect in the product and resultant injuries. The court followed the landmark case of Henningsen v. Bloomfield Motors and Chrysler Corp., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960), where the steering mechanism of a new automobile failed while the plaintiff was driving along a smooth highway. That court held the defendant retailer and manufacturer liable because of a defect in operation of a product that would be dangerous if defectively manufactured. In ruling on submissibility of evidence quite similar to ours, that court said (at l. c. 97), and we say here: "In our view, the total effect of the circumstances shown from purchase to accident is adequate to raise an inference that the car was defective and that such condition was causally related to the mishap." Plaintiff made a submissible case as to the manufacturer, defendant Ford. We move on to consider McMahon's challenge of submissibility.

Plaintiff has moved to dismiss McMahon's appeal for failure to make a jurisdictional statement and to quote a refused instruction in its brief. We granted McMahon leave to supply these by amendment; McMahon has complied, and we deny plaintiff's motion.

In McMahon's "Points Relied On" it says the trial court erroneously denied its motion for a directed verdict because "plaintiff's testimony did not make a submissible case against said defendant." This is a mere abstract assertion: it does not state *why* plaintiff failed. Such a sweeping challenge does not comply with Civil Rule 83.05(e), V.A.M.R. Jones v. Farm Bureau Mutual Ins. Co., Mo.App., 284 S.W.2d 11[3]. We have decided, however, to answer the challenge raised in McMahon's argument: that a retailer is liable only when the defect in the product is discoverable, and here "nothing was shown which could have caused seller to have realized that the chattel was unsafe, [so] seller had no duty to subject the chattel to a rigid inspection or test for a latent defect. Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S.W. 2d 140, 144." Even if we accept this dubious premise, the Zesch case does not help McMahon; it did not decide the question of a retailer's liability on an implied warranty of fitness. In *Zesch* the plaintiff based his case on the seller's *negligence* in failing to inspect, and he failed to prove it. Similarly, McMahon's cited cases of Shroder v. Barron-Dady Motor Co., Mo., 111 S.W.2d 66, and Gibbs v. General Motors Corp., 350 Mo. 431, 166 S.W.2d 575, are not in point. Neither case dealt with a retailer's implied warranty of fitness; in each, plaintiff charged the retailer with negligent failure to inspect.

Other cases do deal directly with a retailer's liability on implied warranty of fitness: In Dubinsky v. Lindburg Cadillac Co., Mo.App., 250 S.W.2d 830[2], we held the defendant retailer liable, saying: "In the sale of an automobile there is an implied warranty that it is reasonably fit for the use intended." This case was discussed and followed in Mullins v. Sam Scism Motors, Mo.App., 331 S.W.2d 185[2]. And a retailer's liability on an implied warranty of fitness was acknowledged in Hays v. Western Auto Supply Co., Mo., 405 S.W. 2d 877[4], citing the Dubinsky case. The reason for this was stated in Vandermark v. Ford Motor Co. et al., (banc, 1964), 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168[8], where the court said: "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. [Citing cases]" We hold that the plaintiff made a submissible case as to defendant McMahon.

Having determined that the evidence warranted the jury in finding both defendants liable, we now take up their attacks on given and refused instructions.

MAI offers two product liability instructions; neither fits plaintiff's theory. MAI 25.02 covers food cases. MAI 25.03 is for breach of warranty of fitness *for a particular use.* It is based on cases preceding Morrow v. Caloric Appliance Corp.; it includes the elements of plaintiff's reliance on the defendant's knowledge of fitness for the product's anticipated particular use by plaintiff. Plaintiff modified these MAI submissions by her given Instruction No. 2:

"Your verdict must be for plaintiff if you believe:

"First, Defendant, Ford Motor Company, manufactured the Thunderbird automobile, and Defendant McMahon Ford Company sold said Thunderbird automobile to plaintiff, and

"Second, the steering gear on said automobile did not work properly, and

"Third, Plaintiff was unable to steer said automobile, and

"Fourth, as a direct result plaintiff was injured."

Ford challenges this instruction on four grounds. First, Ford says the instruction did not require the jury to find there was a "defect" in the steering gear; second, that it did not require a finding that "a defect in the steering gear" was the cause of "the failure of the steering gear to function properly." As discussed above, the "defect" in the steering gear was an evidentiary fact. The ultimate fact was whether the steering mechanism worked properly. By her verdict director, plaintiff submitted that "the steering gear on said automobile did not work properly." By this she submitted the issue of product liability imposed by Morrow v. Caloric Appliance Corp. This part of the instruction reasonably conformed to the language of the other two breach of warranty instructions, MAI 25.02 and 25.03. Further, it conformed to Civil Rule 70.01(e), V.A.M.R., being simple, brief, impartial, and free from argument and detailed evidentiary facts. The instruction would be clearer if paragraph "Third" had read: "Third, plaintiff was *thereby* unable to steer said automobile." However, this was not the point Ford raised; its objection goes to paragraph "Second." Further, the element of causation was supplied by the last paragraph: "Fourth, as a direct result plaintiff was injured." This followed the language of MAI 25.02 and 25.-03. The instruction was not prejudicially erroneous on the two grounds assigned.

Ford's third complaint is that plaintiff's verdict director erroneously omitted a requirement that the defect existed at the time the car left its control. Section 402A, 2 Restatement of Torts 2d, imposes liability on a manufacturer if its product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." Comment g. says that liability exists only where the product is defective when it leaves the seller's hands; that the burden of so proving is on the plaintiff. This is in accord with Morrow v. Caloric Appliance Corp. supra, where the verdict director required the jury to find that the stove "when sold to plaintiff was in the same condition as when manufactured." It is in accord with MAI 25.02, which requires that the food or substance was unfit for use "when sold by the defendant." As said, we believe the total effect of the circumstances shown was enough to raise an inference that the defect which existed at the time of collision existed when Ford delivered the Thunderbird to McMahon. There was no evidence to the contrary. That inference was for the jury, not the court; but by omitting the time element from the instruction, the court compelled an inference that should have been left to the jury's discretion. (By the same reasoning, the instruction should have based McMahon's liability on the existence of a defect at the time the car was sold to Mrs. Williams.) The instruction was erroneous, and requires a new trial.

In reaching this conclusion of separate liability of Ford and McMahon, we are aware that the leading California case of Vandermark v. Ford Motor Co., supra, holds an automobile manufacturer is liable for ultimate defects even though caused by intervening acts of its retail dealer. This, on the apparent theory of agency. We have no evidence here, as there was in the Vandermark case, that Ford delegated to McMahon the authority to make "final inspections, corrections and adjustments necessary to make the car ready for use." Absent such evidence, the Vandermark case is not persuasive.

Last, Ford and McMahon each object to plaintiff's verdict director because it requires a verdict against both defendants. Similarly, each objects to the refusal of its separate converse instruction and the giving of a joint converse instruction. These difficulties flowed from the erroneous assumption in the verdict director that Ford and McMahon were jointly liable, if at all. As said, there is a distinction between Ford's and McMahon's liability. On retrial a proper verdict director will indicate proper converse instructions.

On this appeal no issue is raised as to plaintiff's damages; there is no need to retry that issue. Under authority of § 512.160(3), V.A.M.S., and Mullen v. St. Louis Public Service Co., Mo. (banc), 389 S.W.2d 838[6], the judgment is reversed for a new trial on the issue of liability only. The $15,000 verdict shall be held in abeyance pending determination of that issue.

PER CURIAM:

The foregoing opinion of Clemens, C., is adopted as the opinion of this court. Accordingly, the plaintiff's motion to dismiss defendant McMahon's appeal is denied; the judgment against each defendant is reversed and the cause is remanded for a new trial on the issue of liability only. The $15,000 verdict is ordered held in abeyance pending determination of the issue of liability.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.