Timothy J. HELM,
Plaintiff-Respondent,

v.

PEPSI–COLA BOTTLING COMPANY
OF ST. LOUIS, INC., Defendant,

Paddock Foods, Inc. d/b/a Mr. J's IGA
Foodliner, Defendant,

The Mead Corporation,
Defendant-Appellant.

No. 50958.

Missouri Court of Appeals,
Eastern District,
Division Two.

Dec. 9, 1986.

Motion for Rehearing and/or Transfer
Denied Jan. 13, 1987.

Application to Transfer Denied
Feb. 17, 1987.

John F. Sander, St. Louis, for defendant-appellant.

Mark I. Bronson, St. Louis, for plaintiff-respondent.

REINHARD, Judge.

Defendant appeals after a jury verdict and judgment against it in this products liability case. We affirm.

Plaintiff filed a three count amended petition seeking to recover damages for injuries allegedly sustained when a carton holding eight sixteen-ounce bottles of Pepsi-Cola collapsed as he was removing it from his car, causing two of the bottles to drop and explode. Count I was premised on a theory of strict liability, Count II on breach of warranty, and Count III on negligence.[1]

A brief discussion of the pertinent facts developed at trial is necessary for a resolution of the issues raised on appeal. On the afternoon of August 12, 1977, plaintiff and his two children went to Mr. J's IGA store where he purchased a carton of eight sixteen-ounce bottles of Pepsi-Cola. When he picked up the carton from the shelf and placed it in his shopping cart it "looked nice ... looked like a good carton that would support the eight bottles." The carton "didn't look like it was used" and plaintiff did not see any tears on the top or sides of the carton; plaintiff did not examine the bottom. The carton remained in the shopping cart while he went through the checkout counter and was not handled by anyone. When he returned to his car he removed the Pepsi from the cart and placed it on the floorboard behind the driver's seat. He then proceeded to his house, took his children and the grocery bag inside, and went back to his car to get the Pepsi. As he lifted the carton out of the car he felt "the front end of it giving and ... two [bottles] just went ahead and dropped right on through.... [He] started to put it back in the car and ... the other two [bottles]" fell through, hit the edge of the car and exploded, severely cutting plaintiff's hand and severing a tendon. When asked on cross-examination whether the carton tore, plaintiff replied: "It was open at the bottom. I don't remember how it happened or what happened to it."

Prior to the accident the "carton seemed pretty solid" and held the bottles in place. The carton did not strike anything as it was being removed, and plaintiff was unaware of anything that might have precipitated its collapse. He testified that the area where the soda had been shelved in the store was dry and not refrigerated, and that there was nothing damp in the grocery cart or the car.

After the accident, plaintiff called his father-in-law, Roy Mead, who went to plaintiff's house and took him to the hospital. Mr. Mead testified by deposition that he just glanced at the carton and did not get within three feet of it. He never examined the bottles or carton closely, and did not handle them since "[w]henever you got a man standing there bleeding, you ain't going to take time to inspect something like that." He did notice that the carton bottom was "flared open" and had come apart "at the seam," but the carton did not appear to be scratched or faded; "it looked like a good carton." He testified that either his wife or daughter cleaned up the debris, but he did not remember what they told him about it.

Plaintiff's wife testified that when she arrived at home after the accident she was informed by her mother that plaintiff had been taken to the hospital and would be in surgery "for quite some time," so she helped the children get ready to go to their grandparents, cleaned up the debris from the accident, and proceeded to the hospital. When she went outside to clean up, her father was in the yard picking up pieces of glass. There was shattered glass near the driver's side of the car and glass was imbedded in the back of the driver's seat as well as in the rear seat. She found the carton, with four full bottles in it, tipped over on the floorboard behind the driver's seat. She testified:

> I picked [the carton] up. And, as I picked it up, I looked at the bottom, and

---

**1.** In addition to Mead Corporation, which allegedly manufactured the carton, the Pepsi-Cola Bottling Company of St. Louis and Paddock Foods, Inc., d/b/a Mr. J's IGA, were named as defendants. Pepsi-Cola entered into a settlement agreement with plaintiff and paid him $6,500. Paddock Foods was dismissed without prejudice immediately prior to trial.

with my maiden name being Mead, I said to my father that—well, it's Mead. It kind of figures. And, I just stuck it in the bag and went about cleaning up the rest of the mess.

Plaintiff's exhibit one, which was identified as an eight sixteen-ounce bottle carrier manufactured by defendant Mead Corporation for Pepsi-Cola, was described by Mrs. Helm as similar to the one involved in plaintiff's accident in that "it had Mead on the left-hand side [of the carton bottom] and a patent on the right-hand side."

Most of the soda that had been spilled was in the driveway, and although the carton had been splattered with soda, no part of it was saturated and the bottom of the carton was dry. It appeared to her that the bottom had "fallen out." She noticed no "rings" on the carton bottom, and it looked like a "very new carton." She testified that the "edge" of the carton was torn "along the side up to about the middle" of the carton, and described the tear as "straight," but "not as if a knife had cut it." She did not notice any tears across the width of the carton.

The carton involved in the accident was not introduced into evidence because of an unfortunate chain of events which culminated in its disappearance. Mrs. Helm placed the carton and bottle pieces in a paper bag which she put out by the back entry door to her house where she kept the trash. Upon plaintiff's release from the hospital he and his wife took the bag containing the carton and glass fragments to the office of Warren Davis, an attorney. They did not see it again. Davis testified that he was originally the attorney for plaintiff in this case but withdrew when it became apparent that he would be called as a witness. Davis said he examined the carton and then, seeking the advice of Morris Chapman, delivered it to Chapman, an attorney in Granite City, Illinois who had referred plaintiff to Davis. Davis explained that he consulted Chapman on the case because Chapman's firm was experienced in personal injury litigation. Davis subsequently attempted to retrieve the paper bag and its contents, but could not locate them.

Davis testified that while the carton was in his possession he examined it for the purpose of ascertaining the identity of the manufacturer and the cause of the accident. He found the words "Mead Corporation" on the carton bottom and contacted the Secretary of State's office regarding defendant's corporate status and location. He did not make any inquiries regarding other bottle carrier manufacturers. Davis noticed a tear on the carton which:

went, not exactly right on the rim but just a smidgen off the rim, inside of an inch and it went basically from just one side of the center line, the seam line here, down toward the edge and then down just off the edge down ... into the second compartment, almost to the end of it.

He further described the carton as "new, newer," and "in good shape except for the tear."

Defendant adduced testimony from Wendell DiPhillips, a senior accountant with Pepsi-Cola Bottling. DiPhillips, who testified that he maintains Pepsi-Cola's accounting records and papers, said that during 1976 and 1977 defendant, Olinkraft and C.W. Zumbiel supplied Pepsi with eight sixteen-ounce bottle carriers. Defendant did not sell any cartons to Pepsi between November 3, 1976, and August 12, 1977. DiPhillips further testified that to reduce expenses Pepsi attempts to carry no greater inventory of cartons than necessary, and that usually the first cartons received are the first to be used.

The only other defense witness was Bob Plaxico, a senior carton designer employed by defendant for 26 years. Plaxico testified he is responsible for designing and modifying bottle carriers, and is involved in all facets of that process. His duties include testing new and existing cartons in defendant's laboratory "as well as [in] the bottler's lab." He identified various cartons manufactured by defendant and its competitors and discussed the efforts made to design safe cartons. The cartons are

made from soft and hard wood materials with no waste or paperboard product. Wet strength additives are introduced into the carton to help it maintain its integrity if it becomes wet, and "aqua shield" is applied to provide a water repellant coating. During the manufacturing process, one out of every twenty-five cartons is inspected. Plaxico also described how the cartons are used after they are sold by defendant, and discussed the process of "drop loading" at bottling plants, which creates "rings" on the carton bottom. Recycling and reuse of the cartons is anticipated.

Counts II and III were dismissed at the close of plaintiff's evidence, and the case was submitted to the jury only on a theory of strict liability. The jury returned a unanimous verdict for plaintiff and assessed damages of $65,000; judgment was entered for plaintiff in the amount of $58,-500 after subtracting the amount of the settlement payment from Pepsi-Cola Bottling.

Defendant, in its first point on appeal, posits error in the court's denial of its motion for directed verdict at the close of all the evidence, asserting that plaintiff failed to make a submissible case. Where failure to grant a directed verdict for the defendant is the error asserted, the appellate court must determine whether or not the plaintiff presented substantial evidence at trial supporting his theory of recovery. In reaching this determination, we must review the evidence in the light most favorable to the plaintiff, giving him the benefit of all reasonable inferences, and disregarding the defendant's evidence except as it aids the plaintiff's case. *Strebler v. Rixman*, 616 S.W.2d 876, 877 (Mo.App.1981).

Plaintiff sought relief pursuant to § 402A of the Restatement (Second) of Torts as adopted by the Missouri Supreme Court in *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo.1969), which provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physi-

cal harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

*Keener*, 445 S.W.2d at 364.

■ Defendant first argues that plaintiff did not adduce sufficient evidence that defendant sold the allegedly defective carton to Pepsi-Cola Bottling. We disagree. Mrs. Helm and Warren Davis consistently testified that "Mead" was written on the carton bottom. While, as defendant asserts, their testimony may not have been entirely accurate as to the details of defendant's logo, the credibility of witnesses is to be determined by the jury.

■ Defendant also argues that plaintiff failed to make a submissible case on the issue of whether the allegedly defective carton was unreasonably dangerous, citing *Kates v. Pepsi-Cola Bottling Company of Salisbury, Maryland, Inc.*, 263 A.2d 308 (Del.Super.1970), which also involved a bottle carton that collapsed. *Kates* is readily distinguished from the instant case. First, the carton in *Kates* appeared to have been used, as opposed to the carton in the case at bar, which was described as "new". Undoubtedly the appearance of a carton would be a factor in determining what reasonable expectations a consumer might have as to its structural integrity. We are not confronted with the question of whether a carton which collapses only after repeated use is unreasonably dangerous; rather, this case presents the issue of whether a carton which appears to be new, but which collapses because of a defect, is unreasonably dangerous.

The testimony of Bob Plaxico, defendant's expert, also distinguishes this case from *Kates* and tends to establish that defective bottle carriers are unreasonably dangerous to consumers when put to their anticipated use. Plaxico described the process of designing bottle carriers and the measures taken to develop cartons that will not collapse. He testified that safety is one of the main factors taken into consideration. When asked whether a defective carton would be dangerous to the consumer he replied, "Anything could happen, yes." He further testified that defendant attempts to "make sure the cartons are produced correctly and glued correctly" because "we don't want anyone injured by this carton." Cartons are tested and designed to avoid collapsing "so [bottles] will not ... hit the ground" and break. Thus we cannot say, as a matter of law, that a soft drink carton manufactured with a defect which causes it to collapse is not unreasonably dangerous.

■ The principal argument advanced by defendant on appeal is that plaintiff did not adduce evidence sufficient to make a submissible case on the issue of whether plaintiff's injuries were caused by a defect which existed in the carton at the time it was sold.

We recognize plaintiff has the burden of establishing that the defect causing the injury existed at the time the product left the defendant's possession and control. *Patterson v. Foster Forbes Glass Co.*, 674 S.W.2d 599, 603 (Mo.App.1984). However, [t]he doctrine of strict liability does not require impossible standards of proof. The proof "must be realistically tailored to the circumstances which caused the form of action to be created." *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631, 639 [14] (8th Cir.1972).

*The existence of a defect may be inferred from circumstantial evidence with or without the aid of expert opinion evidence. Williams v. Ford Motor Co.*, 411 S.W.2d 443, 447 [3] (Mo.App. 1966).

*Winters v. Sears, Roebuck and Co.*, 554 S.W.2d 565, 569 (Mo.App.1977) (emphasis ours). Moreover, "mere failure to produce the alleged defective product is not fatal to the plaintiff's opportunity to make a submissible case." *Brissette v. Milner Chevrolet Co.*, 479 S.W.2d 176, 181 (Mo.App. 1972). As was noted in *Patterson:*

In determining whether a submissible case is made we examine the inferences to be drawn from the circumstantial evidence and determine whether those inferences are reasonably probable without resorting to guesswork or speculation. If they are, the evidence is sufficient. (Citations omitted.)

674 S.W.2d at 603.

Plaintiff relies principally upon *Patterson* to support its contention that it made a submissible case. *Patterson* involved a products liability claim resulting from the explosion of an empty glass baby bottle which had been placed on a kitchen table. The bottle had been manufactured by the defendant and purchased by the plaintiff from a retailer approximately a year before the accident. Although plaintiff adduced no expert testimony and was unable to produce the bottle, we held that the circumstances were such that a submissible case was made. 674 S.W.2d at 599.

Two important factors in *Patterson* were the nature of the incident and the plaintiff's use of the product for an extended period of time. Defendant has attempted to distinguish the instant case from *Patterson* on the basis of those factors, emphasizing in particular that plaintiff in this case used the product for less than an hour. However, in emphasizing the factors which were crucial in the *Patterson* factual scenario defendant ignores the more substantial issue of *why* those factors were important. As we explained in *Patterson:*

[The possibility of physical damage to the bottle] was sufficiently negated by the period of the use of the product and the nature of the accident. The bottle did not break nor crack. It exploded with great force. It is reasonable to conclude that had the bottle been physi-

cally damaged prior to plaintiff's purchase, the results of that damage would either have been immediately apparent, as with a crack, or would have shown up shortly after purchase through leakage or breakage. That neither occurred and that the accident involved an explosion of an empty bottle at room temperature after eleven months of careful use creates a reasonable inference that the defect was in the physical composition of the bottle rather than originating from an outside source.

674 S.W.2d at 604. Thus *Patterson* did not establish a requirement that the plaintiff use the allegedly defective product for a long period of time; instead, it recognized that in the case of durable goods a manufacturing defect may not manifest itself until after an extended period of use, whereas damage caused by subsequent handling of a durable product should be "immediately apparent" or discernible "shortly after purchase." However, extended use of a product designed for *limited* use, such as a bottle carrier, would lend support to an inference that the carton's collapse was due to natural fatigue of the carton material rather than a manufacturing defect.

We believe that plaintiff adduced evidence sufficient to create a reasonable inference that the defect was in the physical composition of the carton rather than originating from an outside source. The carton appeared to be "new" and looked "good" when purchased. Plaintiff noticed no tears on the top or sides, and his testimony tended to eliminate potential sources of moisture which could have caused the carton to become wet. Plaintiff's testimony also negated mishandling on his part. Furthermore, the nature of the occurrence indicates that it was not the result of damage originating from an outside source. The carton supported the bottles when plaintiff removed it from the shelf and placed it in the grocery cart, and again when he transferred it from the cart to his automobile. There was no indication of instability prior to the accident. This would seem to militate against defendant's hypothesis that

the carton was torn when plaintiff purchased it. We conclude that plaintiff's evidence was sufficient to make a submissible case.

■ Defendant asserts in its second point on appeal that:

There was an accumulation of improper questions, comments, and arguments by plaintiff's counsel during direct examination of witnesses O'Kelley, Davis, plaintiff, and Theila Helm, cross-examination of witness Plaxico, and plaintiff's closing argument, pertaining to plaintiff's exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11; that although the court sustained most of defendant's objections to the questions or comments, plaintiff's counsel persisted with said questions and comments, and the continual questions and comments by plaintiff's counsel implied that if the evidence was admitted, it would be favorable to plaintiff; and plaintiff counsel's action herein was prejudicial to the defendant and deprived it of a fair trial.

Defendant's point is insufficient under Rule 84.04(d) in that it does not indicate what, if any, action taken by the court was erroneous. Defendant did not make a motion for mistrial or any other request for relief during the trial, raising this issue for the first time in its motion for new trial. Assuming for the sake of argument that defendant's point relates to the court's denial of its post-trial motion, we find it to be meritless. In ruling on a motion for new trial concerning misconduct, the trial court is vested with a wide discretion in determining whether, in view of the remedial actions already taken during trial, the alleged misconduct was prejudicial and substantially influenced the verdict. *Ryan v. Campbell "66" Express*, 304 S.W.2d 825, 827 (Mo. banc 1957). Our examination of the record indicates that the trial court did not abuse its discretion in denying defendant's motion on this point. We note that "[a] new trial is clearly not mandated" where a party has repeatedly sought to introduce improper evidence. *Duke v. Gulf & West-*

*ern Mfg. Co.,* 660 S.W.2d 404, 417 n. 14 (Mo.App.1983).

Finally, defendant requests that we grant it a new trial under the "plain error" doctrine because of the alleged intentional nondisclosure of prior lawsuits by three jurors during voir dire. Defendant does not cite any trial court action as erroneous under this point, and it failed to raise the issue of juror misconduct in its motion for new trial. We do not believe that this is a proper situation for review under the plain error doctrine. We also deny defendant's motion for remand to the trial court.

The judgment is affirmed.

SMITH, P.J., and DOWD, J., concur.